UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONELL GLEN STETLER, ) | 1:07cv0123 DLB |
| ) | |
| Plaintiff, ) | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. ) | (Document 26) |
| GREENPOINT MORTGAGE FUNDING ) INC., PATRICK MITCHELL, ) | |
| Defendants. ) | |

Defendant Patrick Mitchell ("Defendant Mitchell") filed the instant motion for summary judgment on November 28, 2007. The matter came on for hearing on January 11, 2008, and the parties agreed to submit the motion on the briefing before the Court. Gary Huss appeared on behalf of Defendant Mitchell. Randy Rumph appeared on behalf of Plaintiff Donell Glen Stetler ("Plaintiff"). Ron Arlas appeared on behalf of Defendant Greenpoint Mortgage Funding, Inc. ("Greenpoint").

**BACKGROUND**

Plaintiff filed this action on January 22, 2007. He names Greenpoint and Defendant Mitchell as Defendants (collectively, "Defendants") and alleges causes of action pursuant to the Real Estate Settlement Procedure Act ("REPSA"), 12 U.S.C. § 2601, et seq., and California law.

Plaintiff filed a first amended complaint on March 28, 2007. Pursuant to this Court's September 11, 2007, order, Plaintiff filed a second amended complaint ("SAC") that provided a

more definite statement as to the First Cause of Action. According to the SAC, the transactions at issue took place in Kern County, and the loans are secured by property located in Kern County. Plaintiff borrowed funds from Greenpoint on January 26, 2006, pursuant to two loan agreements secured by residential real property.

In the First Cause of Action for violation of REPSA's Antikickback provision, 12 U.S.C. § 2607, Plaintiff alleges that Greenpoint paid Defendant Mitchell "a fee, kickback or thing of value related to making the loans" in the form of a yield spread premium ("YSP")[1] in the amount of $3,120.00 on one loan and $195.00 on the other. In the Second Cause of Action, Plaintiff alleges that Defendant Mitchell breached his fiduciary duties by failing to inform Plaintiff that he was receiving money from Greenpoint, failing to inform Plaintiff that the loan was a reverse amortization loan or that the payments increased, and by informing Plaintiff that the loans were used on all his properties and that they were the best deal for Plaintiff. In the Third Cause of Action for constructive fraud, Plaintiff alleges that Defendant Mitchell intentionally failed to disclose that he was receiving funds from Greenpoint and that the loan was a reverse amoritization loan. In the Fourth Cause of Action for violation of the California Unfair Trade Practices Act, Plaintiff alleges that Defendants provided settlement statements in violation of 12 U.S.C. § 2603 and 24 C.F.R. § 3500.7-3500.8. Specifically, he contends that the statements failed to disclose that Defendant Mitchell would be receiving funds from the escrow involved in the loans. Plaintiff seeks statutory, exemplary and punitive damages as well as attorneys' fees and costs.

Defendant Mitchell filed his answer on September 17, 2007. Greenpoint filed its answer on October 2, 2007.

On November 28, 2007, Defendant Mitchell filed the instant motion for summary judgment. Plaintiff filed his opposition on December 28, 2007, and Defendant Mitchell filed his reply on January 7, 2008.

---

[1] A YSP is a fee paid by mortgage lenders to mortgage brokers based on the difference between the interest rate at which the broker originates the loan and the par, or market rate offered by the lender. Schuetz v. Banc One Mortg. Corp., 292 F.3d 1004 (9th Cir. 2002).

**UNDISPUTED MATERIAL FACTS**

The Court finds that the following facts are undisputed. Defendant Mitchell conducted business as a loan broker in Kern County in 2006. Declaration of Patrick Mitchell ("Mitchell Dec."), ¶ 2.

According to Imogene Doerfler, Plaintiff's mother, she suggested that Plaintiff use his good credit to purchase a home in 2004, and then allow his brother to live in the home and make payments. Declaration of Imogene Doerfler ("Doerfler Dec."), ¶ 2. She used Defendant Mitchell to find a mortgage for the purchase and was actively involved with the process as Plaintiff travels with his job. Doerfler Dec., ¶ 3. In 2005, the parties decided to refinance the home.

Plaintiff entered into a Mortgage Loan Origination Agreement ("Agreement") with Defendant Mitchell. Mitchell Dec., ¶ 3; Ex. B, attached to Motion. The Agreement is signed by Plaintiff and dated December 5, 2005. The Agreement states that Defendant Mitchell is an independent contractor and not Plaintiff's agent, and explains that Defendant Mitchell will be compensated by the lender or borrower, or a combination of both. Ex. B.

In processing the loan,[2] Defendant Mitchell provided services to Plaintiff and the lender, including analyzing Plaintiff's income and debt, explaining the loan products and process to Plaintiff and his mother, collecting Plaintiff's financial information, obtaining a credit report, obtaining an appraisal, and preparing a loan package for Plaintiff and submitting it to Greenpoint. Mitchell Dec., ¶ 6; Deposition of Patrick Mitchell ("Mitchell Dep."), at 56-64.

An Estimated Closing Statement that identified all estimated settlement charges was provided to Plaintiff. Ex. G, attached to Motion. Specifically, the Estimated Closing Statement dated January 19, 2006, and signed by Plaintiff, discloses YSPs in the amounts of $3,120.00 and $195.00. Ex. G.

---

[2] There were two components to Plaintiff's loan product. The first was a traditional loan in the amount of $312,000, and secured by a Deed of Trust on the property. The second was Home Equity Line of Credit ("HELOC") in the amount of $39,000, and secured by a Second Deed of Trust on the property. The YSP tied to the traditional loan was in the amount of $3,120.00, which represents one percent of the loan amount. The YSP tied to the HELOC was $195.00, which represents .05 percent of the HELOC.

1    The closing documents were signed by Plaintiff on January 20, 2006, at his home in
2  Colorado.³  Ex. H, attached to Motion.  Plaintiff admits that he reviewed the documents before
3  signing them, and admits that he could have taken more time to review them if he wanted to do
4  so.  Deposition of Donell Glenn Stetler ("Plaintiff's Dep."), at 34, 49-53.
5    Defendant Mitchell received fees for his services as a loan broker from Greenpoint in the
6  form of YSPs.  Mitchell Dec., ¶ 11.  Defendant Mitchell disclosed to Plaintiff before closing that
7  Greenpoint was the lender and that the loan in question was a reverse amortization loan or that
8  payments could increase.  Mitchell Dec., ¶ 10.  Exhibit E is a copy of the Loan Program
9  disclosure form, sent by Defendant Mitchell and signed and returned by Plaintiff on January 20,
10 2006.  The form explains the Adjustable Rate Mortgage as well as the negative amortization
11 aspect of the loan.  Exhibit I is the Adjustable Rate Note signed by Plaintiff (but not dated),
12 which sets forth the interest rate (2.5 percent) as well as notice that the rate may change.  It also
13 explains that when the monthly payment is less than the interest portion of the monthly payment,
14 the difference will be added to the unpaid principle (i.e., negative amortization).

**DISCUSSION**

A.    Summary Judgment Standard

   Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and "the non moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"  T.W. Electric Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d

---

³ There appears to be a disagreement as to the closing date.  Plaintiff believes that the loan closed on January 20, 2006, the day he signed the documents at his home in Colorado.  Defendant Mitchell states that the loan closed on January 27, 2006.  Although Plaintiff may have signed the documents on January 20, it is possible that the loan did not actually close until January 26 or 27.  Both Estimated Closing Statements cite a closing date of January 27, 2006.  Ex. G.  Similarly, the Lender's Closing Instructions cite an estimated closing date of January 21, 2006.  Ex. J.  The final Settlement Statement (HUD-1) and Final Closing Statement have a closing date of January 26, 2006.  Ex. J.  The actual date of closing, though, is not as relevant as Plaintiff would have this Court believe.  Prior to January 20, 2006, there were numerous disclosures in the documents Plaintiff received and signed.  The Court discusses this in detail throughout this opinion.

626, 630 (9th Cir. 1987)(quoting Fed.R.Civ.P. 56(e)). As to the specific facts offered by the nonmoving party, the court does not weigh conflicting evidence, but draws all inferences in the light most favorable to the nonmoving party. Id. at 630-31.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., 809 F.2d at 630, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out

of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

B.  Analysis

Defendant Mitchell's motion for summary judgment is based on his argument that he did not have a fiduciary relationship with Plaintiff and, in any event, all required disclosures were made.

In opposition, Plaintiff argues mainly that neither he nor his mother "fully comprehended" the loan and that Defendant Mitchell did not explain the specifics to them. Even though he signed the documents, he did not read them because the "notary merely handed him documents and stated for him to 'sign here.'" Opposition, at 3; Deposition of Imogene Doerfler ("Doerfler Dep."), at 45-46, 54.[4]

1.  *First Cause of Action*

In the First Cause of Action, Plaintiff alleges that Greenpoint violated REPSA's Antikickback provision, 12 U.S.C. § 2607, by paying Defendant Mitchell "a fee, kickback or thing of value related to making the loans" in the form of YSPs.

Section 8(a) provides "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). Section 8(c)(2) provides: "Nothing in this section shall be construed as prohibiting ... the payment to any person of a bona fide salary or

---

[4] The Court notes that despite Ms. Doerfler's contention that they did not read the documents, Plaintiff testified that he did in fact read them. Plaintiff's Dep., at 34. Plaintiff acknowledges this discrepancy in his opposition.

compensation or other payment for goods or facilities actually furnished or for services actually performed ...." 12 U.S.C. § 2607(c)(2).

Defendant Mitchell argues that summary judgment should be granted because Plaintiff alleges only a "subjective, self-serving claim that the compensation paid to Defendant Mitchell by the lender was an illegal 'kickback' under RESPA." Motion, at 7. In Schuetz v. Banc One Mortg. Corp., 292 F.3d 1004, 1014 (9th Cir. 2002), after reviewing HUD policy statements and cases from the Eleventh Circuit, the court determined that YSPs are not per se illegal and that the two-prong test contained in HUD's 2001 Statement of Policy provides the appropriate standard of liability for YSPs under RESPA. "The HUD test focuses on whether compensable services of the sort identified in the 1999 Statement[5] are provided, and if they are, then on whether the total compensation (without regard to whether it comes from the borrower, the lender, or both) is reasonably related to the services provided." Id. at 1013.

Plaintiff correctly argues that whether the YSPs violated RESPA is a fact intensive inquiry, but the undisputed facts before the Court demonstrate that there has been no violation. Plaintiff's argument is based mainly on his mother's belief that Defendant Mitchell spent less than one hour on the loan because he used an application for a prior loan. Doerfler Dec., ¶ 5; Plaintiff's Dep., at 19. Having obtained a prior loan for Plaintiff, Defendant Mitchell explained at his deposition that his processor uses computer software to generate loan documents that collects and stores information to assist in generating future applications. Mitchell Dep., at 15. He testified that the loan documents referenced the prior address possibly because his processor did not update the address in the computer files. Mitchell Dep., at 55. Although his processor created the documents, Defendant Mitchell performed all the research for the loan, obtained the necessary information, opened escrow, and ensured that all escrow instructions were completed.

---

[5] Permissible services include taking information from the borrower and filling out the application, analyzing the prospective borrower's income and debt and pre-qualifying the borrower, educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, collecting financial information, initiating/ordering verifications of employment, initiating/ordering requests for mortgage and other loan verifications, initiating/ordering appraisals, initiating/ordering inspections or engineering reports, providing disclosures (truth in lending, good faith estimate, and others) to the borrower, maintaining regular contact with the borrower, realtors and lender, and participating in the loan closing. Schuetz, 292 F.3d at 1007, n. 1.

Mitchell Dep., at 56-63.  When asked how much time he spent on this loan, Defendant Mitchell testified that he couldn't give an exact estimate, but that it was many hours.  Mitchell Dep., at 65.  He further explained that he spent much more time on this loan than most because it involved two loans and went through many revisions before the final product.  Mitchell Dep., at 77-78.

Plaintiff's belief that Defendant Mitchell spent less than one hour in completing his loan transaction is untenable, given Defendant Mitchell's testimony to the contrary and, more importantly, the fact that the loan in question was for a different loan product and a different property than the prior loan.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).  Therefore, based on the record before the Court, the YSPs were paid to Defendant Mitchell ion exchange for services actually rendered, and he is entitled to summary judgment on the first cause of action for violation of RESPA.

2.     *Second Cause of Action*

In the Second Cause of Action, Plaintiff alleges that Defendant Mitchell breached his fiduciary duties by failing to inform Plaintiff that he was receiving money from Greenpoint, failing to inform Plaintiff that the loan was a reverse amortization loan or that the payments increased, and by informing Plaintiff that the loans were used on all of Defendant Mitchell's properties and that they were the best deal for Plaintiff.

Citing the Mortgage Loan Origination Agreement, Defendant Mitchell contends that no agency relationship existed and therefore, there was no fiduciary relationship.  Ex. B to Motion.  Indeed, the Agreement clearly states that Defendant Mitchell was acting as an independent contractor and not as an agent.  It also explains that Defendant Mitchell will be receiving compensation from either the borrower or the lender, or both.  Ex. B to Motion.  Plaintiff signed this Agreement on December 5, 2005.

Although Plaintiff contends that this document is forged, he submits no convincing supporting evidence.  He points to his mother's statement that she keeps copies of all documents and that she doesn't have a copy of this document in her files.  Plaintiff then leaps to the conclusion that it must be forged, notwithstanding the fact that the signature is unmistakably

Plaintiff's. Doerfler Dec., ¶ 5. Such speculative, unsupported statements are not sufficient to render a fact disputed. Moreover, Defendant Mitchell testified at his deposition that he did not have "somebody else" sign the document. Mitchell Dep., at 43.

The Court therefore finds that Defendant Mitchell did not owe a fiduciary duty to Plaintiff. Pursuant to the terms of the Mortgage Loan Origination Agreement, he was not acting as Plaintiff's agent.

Perhaps anticipating that this Court would find no reason to doubt the validity of Exhibit B, Plaintiff attempts to establish a fiduciary duty nonetheless by relying on Wyatt v. Union Mortgage Co., 24 Cal.3d 773, 782 (1979), an action against a mortgage loan broker seeking damages for breach of duties allegedly owed to plaintiffs during the negotiation of a second mortgage loan. There, the court explained that the general principles of agency combine with statutory duties created by California Real Estate Law "to impose upon mortgage loan brokers an obligation to make a full and accurate disclosure of the terms of a loan to borrowers and to act always in the utmost good faith toward their principals." This includes a duty to disclose all material facts which might affect the principal's decision. Id. In Wyatt, the plaintiffs testified that they did not read the stack of written loan documents before signing them, but asked the broker specific questions about the interest rate, etc. In response to their questions, they received "materially misleading and incomplete information," which justified the jury's conclusion that the broker did not satisfy his fiduciary obligations of disclosure and good faith. Id. at 783. The court explained:

> Here, the record discloses that respondents were persons of modest means and limited experience in financial affairs, whose equity in their home was their principal asset. They retained a mortgage loan broker to negotiate for them highly complex loan terms and they may be assumed to have justifiably relied on the latter's expertise. Against such a backdrop, the broker's failure to disclose orally the true rate of interest, the penalty for late payments or the swollen size of the balloon payment clearly constituted breach of the broker's fiduciary obligations. It is noteworthy also that the provisions regarding interest rate, late charges and balloon payment were highly unfavorable to the borrower and yet the broker made no attempt to draw his clients' attention to these matters.

Id. at 783-784.

Neither the Court nor the parties dispute that Defendant Mitchell owed certain duties to Plaintiff. These duties, however, arise from a prohibition against making affirmative

9

misrepresentations rather than from a duty to explain the ins and outs of each loan product. Certainly, Defendant Mitchell had a duty to exhaustively explain issues that Plaintiff now alleges he did not understand.  In this regard, Plaintiff and his mother were free to ask questions, and the evidence shows that they often asked questions.  Defendant Mitchell had a duty to respond to Plaintiff's inquiries with truthful, straightforward responses, and there is no evidence that he did anything to the contrary.  Plaintiff's amorphous statements that Defendant Mitchell led him to believe that this was the "best" loan for him is not sufficient to overcome the lack of credible evidence of an affirmative misrepresentation.

In any event, the evidence before the Court demonstrates that the issues identified by Plaintiff were in fact disclosed.  In addition to the Mortgage Loan Origination Agreement, which spelled out the relationship between the parties and explained that Defendant Mitchell may be compensated by the lender, Plaintiff signed a document entitled "Loan Program Disclosure," which explained how the interest rate and monthly payment could change, and, more importantly, defined "negative amortization" and explained how it could affect his loan, i.e., that the principle balance of the loan could increase if monthly payments did not cover the interest due.  Plaintiff signed this document on December 5, 2005.  Ex. E to Motion.

Plaintiff also signed the Adjustable Rate Note, which sets forth the interest rate as well as notice that the rate may change.  Ex. I, attached to Motion.  It also explains:

(E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments.  If so, each month that my monthly pa7ument is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal.

Ex. I, at 2.

Plaintiff signed an Estimated Closing Statement dated January 19, 2006, which discloses YSPs in the amounts of $3,120.00 and $195.00.  Ex. G.  Although there is another Estimated Closing Statement dated January 25, 2006, five days after Plaintiff signed a majority of the closing documents, it does not negate the disclosure made in the January 19, 2006, document.

Plaintiff does not necessarily dispute the contents of the documents relied upon by Mr. Mitchell and the Court. Rather, Plaintiff's argument focuses on his belief that the disclosures were somehow insufficient to satisfy the duties he attempts to assign to Defendant Mitchell. It is undisputed, though, that Plaintiff reviewed the documents before signing them, and he admits that he could have taken more time to review them if he wanted to do so. Plaintiff's Dep., at 34, 49-53. Insofar as Plaintiff contends that certain disclosures were insufficient because they were signed either on the closing date (using Plaintiff's January 20 closing date) or the day before, and/or they were "slipp[ed] in . . .among a myriad of documents signed by Plaintiff," his argument fails. Opposition, at 6. Plaintiff read and signed the documents that disclosed the issues that he now complains of. That he may not have understood the meaning of the documents, as he now seems to contend, does not render otherwise sufficient disclosures ineffective.

Nor does Wyatt compel a different result. Although Wyatt recognized that in some circumstances, a fiduciary's duty may extend beyond written disclosures in loan documents, the holding was based in large part on the Wyatt plaintiffs' specific situation. There, the plaintiffs testified that they did not read the written loan documents before signing them, but did ask specific questions of their broker. In response, they received "materially misleading and incomplete information." Wyatt, 24 Cal.3d at 782-783. The duty to go beyond written disclosures was therefore based in part on affirmative misrepresentations. The facts before this Court do not suggest that Defendant Mitchell made any misrepresentations or otherwise attempted to mislead Plaintiff. Given the absence of any affirmative misrepresentations and Plaintiff's testimony that he *did* read the documents that he signed and understood that he could have had more time to review them, the Court refuses to extend Wyatt to the facts of this case. Therefore, based on the record before the Court, Defendant Mitchell is entitled to summary judgment on the second cause of action.

3.  *Third Cause of Action*

The Third Cause of Action alleges constructive fraud insofar as Defendant Mitchell intentionally failed to disclose that he was receiving funds from escrow by Greenpoint and that the loan was a reverse amoritization loan.

As discussed above, the evidence before the Court demonstrates that Defendant Mitchell did not owe Plaintiff a fiduciary duty and that there was no intentional failure to disclose information. Therefore, Defendant Mitchell is entitled to summary judgment on the third cause of action.

4.  *Fourth Cause of Action*

In the final cause of action, Plaintiff alleges violations of the California Unfair Trade Practices Act. Specifically, he alleges that Defendants violated 12 U.S.C. § 2603 and 24 C.F.R. § 3500.7-3500.8 by providing settlement statements that failed to disclose that Defendant Mitchell would be receiving funds from the escrow involved in the loans.

According to Plaintiff's opposition, this claim is based on Defendant Mitchell's alleged (1) failure to disclose his compensation from Greenpoint; (2) failure to advise Plaintiff that the loan was a negative amortization loan; (3) fraudulent representation that the loan was the "best loan for Plaintiff;" and (4) violation RESPA's settlement statement requirements. As to the first three issues, Defendant Mitchell did not owe Plaintiff a fiduciary duty and these claims fail, as detailed above.

With regard to the settlement statement, Plaintiff contends that Defendants violated 24 C.F.R. § 3500.7 and 3500.8. Section 3500.7 requires that a Good Faith Estimate be provided to the applicant no later than three business days after the application is received or prepared, and that it contain the following information:

> (c) Content of good faith estimate. A good faith estimate consists of an estimate, as a dollar amount or range, of each charge which:
>
> (1) Will be listed in section L of the HUD-1 or HUD-1A in accordance with the instructions set forth in Appendix A to this part; and
>
> (2) That the borrower will normally pay or incur at or before settlement based upon common practice in the locality of the mortgaged property. Each such estimate must be made in good faith and bear a reasonable relationship to the charge a borrower is likely to be required to pay at settlement, and must be based upon experience in the locality of the

mortgaged property. As to each charge with respect to which the lender requires a particular settlement service provider to be used, the lender shall make its estimate based upon the lender's knowledge of the amounts charged by such provider.

Plaintiff attaches a Good Faith Estimate to his opposition, which he signed and dated on December 5, 2005. Ex. 1.  While he admits that this was provided within the correct time frame, he argues that it is insufficient because it does not contain any information of the YSPs.  This estimate shows a loan amount of $38,500, and therefore appears to be connected only with the HELOC.  The YSP related to the HELOC was $195.00, and this amount could be wrapped into certain amounts identified on the estimate, i.e., a $350.00 lenders' fee or a $250.00 closing/escrow fee.  Moreover, the Good Faith Estimate is just that- an *estimate* of the costs a borrower will have at closing.  The estimates often go through several revisions, as they did here, and the earliest estimates are generally the least accurate.  Indeed, the estimates provided as the closing date approached became more concrete.  Absent a showing of bad faith or some affirmative misrepresentation, the Court will not find a violation of RESPA based on the December 5, 2005, Good Faith Estimate.

For the above reasons, Defendant Mitchell is entitled to summary judgment on the fourth cause of action.

**ORDER**

Therefore, IT IS HEREBY ORDERED that Defendant Mitchell's motion for summary judgment be GRANTED.

IT IS SO ORDERED.

Dated:   **January 22, 2008**               /s/ **Dennis L. Beck**
                                       UNITED STATES MAGISTRATE JUDGE